David A. JOHNSON, on his own behalf and on behalf of all others similarly situated, Plaintiff,

v.

UNIVERSITY OF IOWA, State Board of Regents, David J. Skorton, M.D., in his official capacity, Douglas K. True, in his official capacity, and Susan C. Buckley, in her official capacity, Defendants.

No. 3–03–CV–10062.

United States District Court, S.D. Iowa, Davenport Division.

Dec. 16, 2004.

James C Larew, Larew Law Office, Iowa City, for David A Johnson On his own behalf and on behalf of all others similarly situated, Plaintiff.

## ORDER

LONGSTAFF, Chief Judge.

Plaintiff David Johnson brings this action asserting that defendant University of Iowa's parental leave policy violates Title VII of the Civil Rights Act of 1964 ("Title VII"), the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the Iowa Civil Rights Act ("ICRA"), and the Equal Protection Clause of the Iowa Constitution. Specifically, Plaintiff asserts that the University's parental leave policy illegally discriminates against biological fathers because it fails to provide them parental leave paid out of accumulated sick leave, but provides biological mothers and adoptive parents that benefit.

The Court has before it (1) Defendants' motion for summary judgment; (2) Plaintiff's motion for partial summary judgment; (3) Defendants' motion to strike references to Jennie Embree; (4) Plain-

tiff's motion to strike for failure to properly deny or qualify responses; (5) Plaintiff's motion to strike responses and expert opinion of Dr. Jennifer Niebyl, M.D.; (6) Plaintiff's motion to strike a portion of the expert opinion of Dr. Kent Jayne[1]; (7) Plaintiff's motion to amend order certifying class; and (8) Plaintiff's motion for leave to file a surreply. Each of the motions are resisted by the opposing party, fully submitted, and ready for ruling. For the reasons outlined below, the Court denies Defendants' motion to strike, denies each of the three Plaintiff's motions to strike, grants Plaintiff's motion for leave to file a surreply, grants Defendants' motion for summary judgment, denies Plaintiff's motion for partial summary judgment, and denies Plaintiff's motion to amend the order certifying the class.

## BACKGROUND

On June 1, 2000, plaintiff David Johnson began employment as a clerk IV in the Office of the Registrar of defendant University of Iowa ("the University"). The University maintains a parental leave policy for all non-union employees, including Plaintiff. The policy provides in relevant part:

22.8 PARENTAL LEAVE POLICY

a. Purpose. To permit parents who have care giving responsibilities to have time off to spend with a child newly added to the family and, to the extent permitted by state law, to be paid during such leave. To adapt an employee's work schedule and/or duties to help reduce conflict with parental obligations.

b. Entitlement to Leave.

---

1. Plaintiff's motion refers to Kent Jayne as "Dr. Kent Jayne," but there is no indication in Jayne's curriculum vitae or in Defendants' materials that he is a doctor. (Defs.' App. at 27.) Therefore, for purposes other than referring to Plaintiff's motion, the Court will not refer to him as a doctor.

(1) Twelve–Month Faculty, Professional, Scientific, and Non–Organized Merit System Staff.

 (a) Biological mothers are entitled to leave for any period of pregnancy-related temporary disability, to be charged against sick leave. Based on current medical practice, a leave of six weeks or less would not require the employee to provide disability documentation. If an employee's accumulated sick leave is insufficient to cover the period of disability, the employee will, at the employee's request, be granted a leave of absence without pay. Any request for absence beyond the period of disability is considered as a leave of absence without pay or as vacation.

 (b) A newly adoptive parent, including a domestic partner, is entitled to one week (5 days) of paid adoption leave to be charged against accrued sick leave. Departments are encouraged to arrange for additional leave as necessary. Departments should work with prospective adoptive parents seeking to adopt through an adoption agency with specific requirements for parental leave, to the extent the adoption leave is not sufficient to undertake an adoption. Time not charged to accrued sick leave may be charged to accrued vacation or taken as leave without pay.

(Am.Compl.¶ 20.)

Plaintiff and his wife, Jennie Embree, a half-time University employee, had a daughter on November 16, 2002. Prior to her birth, both parents sought parental leave. (Johnson Aff., Pl.'s App. at 6–7.)

Plaintiff made repeated efforts to determine whether under the policy a biological father could charge the same five days of parental leave against accrued sick leave that adoptive parents could. (Johnson Aff., Pl.'s App. at 3–6.) University administrators, including defendant Susan Buckley, Director of Human Resources, Dave Martin, President of the Staff Council, and Jan Gorman, an employee of the Department of Human Resources, uniformly responded to Plaintiff's inquiries, each stating that biological fathers could not receive parental leave under the policy.[2] This is not to say that the University denies all caregiving leave to biological fathers. All employees are allowed to apply vacation time toward leave, or take unpaid leave of up to twelve weeks. Employees whose partner or spouse works for the University are allowed twelve weeks leave between them. Biological fathers are only prevented from applying accumulated sick leave to caregiving leave. Plaintiff took an unpaid leave of absence after the birth of his daughter.

Embree works at the University's College of Nursing as a half-time employee—about twenty hours per week. Like Plaintiff, she is subject to the University's parental leave policy. Under the policy, Embree took four weeks of pregnancy disability leave paid out of accumulated sick leave. For the two weeks following this time off, she worked ten hours per week from home, about half of her normal work week. The parties dispute the characterization of the final two weeks of leave time. Defendants assert that during those two weeks Embree received partial disability leave. (Buckley Aff., Defs.' App. Vol. III at 3.) Plaintiff claims that Embree had recovered from her pregnancy disabil-

---

**2.** The Court notes that Plaintiff did not formally request to have the leave he sought paid for out of accumulated sick leave because he made enough attempts to have the policy interpreted in his favor or to change the policy that he knew the University would deny his request.

ity after the four weeks of total leave, and therefore the half-time leave was unrelated to Embree's disability. (Johnson Aff., Pl.'s App. at 6–7.)

On June 17, 2003, Plaintiff filed the present class action in this Court, naming as defendants the University, the State Board of Regents, the President of the University, David J. Skorton, M.D., the University's Vice President for Finance and Operations, Douglas K. True, and the University's Director of Human Resources, Susan C. Buckley. Plaintiff amended his complaint on October 8, 2003. Plaintiff groups his federal claims and state claims under headings "A" and "B," respectively. Count I of the federal claims alleges Defendants' conduct constitutes sex discrimination in violation of Title VII of the Civil Rights Act of 1964, ("Title VII"), 42 U.S.C. § 2000e–2 (2003). Count II of the federal claims alleges Defendants' conduct violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Under the state claims heading, Count I alleges that the policy violates the Iowa Civil Rights Act ("ICRA"), Iowa Code § 216.6(1) (2003). Count II alleges that the policy violates the Equal Protection Clause of the Iowa Constitution. Iowa Constitution, Article I, § 6.

## DISCUSSION

### I. PRELIMINARY MOTIONS

Before the Court can analyze the merits of the cross motions for summary judgment, it must evaluate the numerous other motions filed by the parties, which are listed above. These motions challenge various components of the summary judgment motions. In addition to their motion for summary judgment, Defendants filed one motion on August 10, 2004, which seeks to strike all references to Plaintiff's wife, Jennie Embree. Plaintiff has five motions in addition to his motion for par-

tial summary judgment. On August 17, 2004, Plaintiff filed two motions to strike evidence set forth by Defendants: one challenges expert testimony of Kent Jayne, and the other challenges expert testimony of Dr. Jennifer Niebyl. Also on August 17, Plaintiff filed a motion asking the Court to strike many of Defendants' individual responses to Plaintiff's asserted material facts. On September 7, 2004, Plaintiff filed a motion to amend the order certifying the class. Finally, Plaintiff filed a motion for leave to file a surreply on September 14, 2004.

### A. Defendants' Motion to Strike References to Embree

Defendants challenge Plaintiff's references to his wife, Jennie Embree, in his motion for partial summary judgment. Defendants make this challenge on the basis that during discovery Plaintiff did not disclose Embree as a potential person with information. Rule 37 of the Federal Rules of Civil Procedure provides:

A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.

Fed.R.Civ.P. 37(c)(1).

█ Federal Rule 26 requires disclosure of persons with information. Fed.R.Civ.P. 26(a)(1). It also requires that parties formulate and adhere to a discovery schedule. Fed.R.Civ.P. 26(f). Under Rule 37, the Court may not consider evidence disclosed after the deadline unless the failure to disclose was substantially justified or harmless. "Decisions on whether there is substantial justification for late-filed discovery materials or whether the late filing

was harmless is within the Court's discretion." *Trost v. Trek Bicycle Corp.*, 162 F.3d 1004, 1008 (8th Cir.1998).

■ The Seventh Circuit has devised a framework for determining whether a failure to disclose is justified:

> "A district court need not make explicit findings concerning the existence of a substantial justification or the harmlessness of a failure to disclose." *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir.1999). However, we have indicated that the following factors should guide the district court's discretion: (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date.

*David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir.2003).

The discovery deadline in this case was May 3, 2004, and the original dispositive motion deadline was June 1, 2004. On May 28, 2004, Defendants moved to extend the dispositive motion deadline to July 19, 2004. Plaintiff did not resist, and the Court granted the motion. By agreement, the parties were still conducting discovery during June, but the agreement covered only depositions. Nothing was done to change the deadline for other discovery.

■ Plaintiff's answers to Defendants' interrogatories, which listed Embree as a person with information pertaining to the suit and contained documentation of Embree's employment, were produced July 22, 2004. Taking into account that (1) Embree works for the University; (2) the trial is not set in the near future—it is set for April 11, 2005; (3) the parties, by agreement, were conducting discovery past the deadline; and (4) the parties had moved the dispositive motions deadline to accommodate the other late discovery, Plaintiff's late filing does not prejudice Defendants' preparation for trial.[3] Therefore, the Court will deny this motion.

## B. Plaintiff's Motion to File a Surreply

■ Plaintiff's motion for leave to file a surreply is related to Defendants' motion to strike. As referenced above, Plaintiff cited his wife's situation in a pleading or motion for the first time in his resistance to Defendants' motion for summary judgment. In their reply, therefore, Defendants submitted an affidavit from Susan Buckley, which challenges Plaintiff's version of Embree's leave. (Buckley Aff., Defs.' App. Vol. III at 2–3.) As the Uni-

---

3. Plaintiff cites Defendants' failure to file a supporting brief with their motion. Local Rule 7.1(d) requires that the "moving party must serve and file a brief containing a statement of the grounds for the motion and citations to the authorities upon which the moving party relies." There are four exceptions, none of which apply here. Further, Local Rule 7.1(b) requires that all motions "include citations to all statutes or rules under which the motion is being made." In their motion, Defendants did not cite any rule or case supporting their motion to strike. The Court notes that Defendants failed to comply with these Local Rules in a number of other instances. Compliance with the Local Rules is not merely a technical matter. Rather, compliance with the Local Rules substantially facilitates the Court's use of materials in addressing a motion for summary judgment. Defendants' counsel is encouraged in the future to heed the warning of Local Rule 1.1(f), which provides that failure to comply with the Local Rules may result in "the exclusion of evidence, the prevention of witnesses from testifying, the striking of pleadings or other papers, the denial of oral argument, and the imposition of attorney fees and costs." LR 1.1(f). The Attorney General's office should consider itself cautioned regarding future transgressions.

versity's Director of Human Resources, Buckley states in her affidavit that Embree's leave was for partial disability leave, not partial caregiving leave.

Affixed to Buckley's affidavit is an exhibit showing that, according to the University's computer records, Embree's leave was categorized and paid as a continuous leave of 5 weeks. (Buckley Aff., Ex. 1, Defs.' App. Vol. III at 4–7.) Plaintiff argues that when he deposed Buckley, she didn't mention knowledge of Embree's circumstances. Plaintiff's basis for moving for leave to file a surreply is that Defendants submitted Buckley's testimony and certain documents regarding Embree for the first time in their reply. This argument mirrors Defendants' justification for producing Buckley's affidavit in their reply, which is that Plaintiff failed to mention Embree until its resistance, so Defendants had to rebut that with Buckley's affidavit. Plaintiff argues that the Court cannot let Defendants introduce new legal arguments or supporting materials without giving Plaintiff the opportunity to respond.

With his surreply motion, Plaintiff submits an affidavit from Embree and accompanying documents showing a factual dispute as to the purpose, scope, authorization, and accounting of Embree's final two weeks of half-time leave. (Pl.'s Mot. to File Surreply, Ex. 41 at 3–5.) These documents suggest that Embree was paid for caregiving leave, not disability leave. In the interest of allowing each party to address the other party's arguments, the Court will grant the motion and allow Plaintiff's surreply materials.

### C. Plaintiff's Motion to Strike Defendants' Responses to Plaintiff's Statement of Material Facts

Plaintiff's next motion alleges that Defendants did not respond to Plaintiff's statement of material facts in accordance with Local Rule 56.1. Regarding responses to an opposing party's statement of material facts, the rule states:

> [a] response that is not admitted must be supported by references to those specific pages, paragraphs, or parts of the pleadings [etc.] . . . that support the resisting party's refusal to admit the statement, with citations to the appendix containing that part of the record. The failure to respond, with appropriate citations to the appendix, to an individual statement of material fact constitutes an admission of that fact.

LR 56.1. Defendants do not cite the appendix or supporting material in many of their responses. Accordingly, Plaintiff moved that the Court strike all of Defendants' improper denials and accept each of Plaintiff's corresponding statements as admitted.

█ Local Rule 56.1 requires attorneys to state the material facts for the Court when a motion for summary judgment is pending so the Court need not scour the record to see which items speak for themselves and which do not. *See Northwest Bank and Trust Co. v. First Illinois Nat'l. Bank*, 354 F.3d 721, 725 (8th Cir.2003) ("Local Rule 56.1 exists to prevent a district court from engaging in the proverbial search for a needle in the haystack.") It is within the discretion of the Court to accept as admitted by Defendants all of Plaintiff's statements of material fact, which Defendants improperly qualified or denied. *Id.*

In *Barnes v. Northwest Iowa Health Center*, 238 F.Supp.2d 1053, 1093 (N.D.Iowa 2002), the court held that one party's failure to comply with this rule[4] by failing to cite the record when denying or qualifying the opposing party's statement of material facts, did not *require* the court to accept the challenged statements of fact

---

**4.** The same Local Rules apply in both the Northern and Southern Districts of Iowa.

as true if the opposing party was not prejudiced by the failure. That court explained its decision this way:

> The court agrees that Barnes did not strictly comply with the Local Rules in her resistance papers. And while Barnes's noncompliance regarding citation to the record resulted in significant effort on the part of the court in pinpointing factual references, Sioux Valley was not prejudiced by Barnes's noncompliance. Furthermore, the court understands the rules and would not interpret arguments to be facts. Thus, while legal arguments rather than facts are not appropriate in a Statement of Disputed Facts under Local Rule 56.1, the court did not consider those arguments in its ruling. The court recognizes its authority to strike portions of Barnes's resistance papers but will exercise its discretion to deny Sioux Valley's motion because Barnes's noncompliance had no bearing on the disposition of Sioux Valley's motion for summary judgment.

*Id.* at 1093.

■ In many of the challenged responses, Defendants resist Plaintiff's characterization of evidence: "[t]he email speaks for itself"; "[t]he testimony speaks for itself"; "[t]he policy speaks for itself." (Defs.' Resp. to Stmt. of Material Facts ¶¶ 13, 24, 28–29, 35.) Defendants framed their responses in this manner because Plaintiff essentially made arguments in his statement of material facts. Defendants do cite the record functionally, if not formally, by referencing the material which Plaintiff cites in his statement of material facts.

Plaintiff has not demonstrated that Defendants' failure to comply with Local Rule 56.1 has caused him prejudice. Like the plaintiff in *Barnes*, Defendants denied those statements in which Plaintiff made arguments or stated opinions about facts. Regarding all such denials, which include

paragraphs 13, 24, 28–29, 32–33, 35–36, and 38 of Defendants' response to Plaintiff's statement of material facts, Plaintiff's motion to strike will be denied.

In addition to statements in which Plaintiff offered opinions or arguments, Defendants denied, without citation, Plaintiff's assertion that he learned he could not apply for sick leave under the policy. (Defs.' Resp. to Pl.'s Stmt. of Material Facts ¶ 53.) Plaintiff learned of the University's interpretation of the policy through correspondence with many parties. (Johnson Aff., Pl.'s App. at 2–6.) Plaintiff is not precluded from making his claims because he did not specifically request sick leave. Based on extensive research on his part, Plaintiff knew that were he to ask, the answer would be no. Requiring such a formality is unnecessary.

The remaining challenged responses deal with Embree. Defendants denied and objected to each of Plaintiff's assertions regarding Embree because Plaintiff did not list Embree as a person with information. The Court has already examined this issue and need not address it further. For the reasons stated above, the Court will deny Plaintiff's motion to strike Defendants' responses.

### D. Plaintiff's Motion to Strike Testimony of Jennifer Niebyl, M.D.

■ Next, Plaintiff moves to strike testimony of Dr. Niebyl, an expert who offers opinions on behalf of Defendants. In the challenged testimony, Dr. Niebyl offers her opinion that women need at least six weeks of disability leave to recover from pregnancy. Plaintiff asserts that her testimony is inadmissible on multiple grounds.

The first of Plaintiff's arguments is that the content of Dr. Niebyl's opinion did not fall under the heading of "offering an opinion on the nature of the leave policy," which was the topic that Defendants, in

their interrogatories, stated Dr. Niebyl would address. (Defs.' App. at 40.) Contrary to Plaintiff's assertion, a medical doctor's opinion on whether six weeks is proper time for presumed pregnancy disability is an opinion on the nature of the leave policy. The Court cannot grant the motion on this basis.

Second, Plaintiff argues that Dr. Niebyl's opinion is irrelevant to the issue of whether the policy allows disability leave alone, or caregiving leave in addition to disability leave. Dr. Niebyl's opinion relates to medical needs of women after childbirth, which Plaintiff states are not disputed. If medical practice is that women need six weeks of disability leave after childbirth, this information is relevant to the amount of time off an employer should give employees.

Third, and without elaboration, Plaintiff argues that Dr. Niebyl's testimony is inadmissible because she didn't develop the leave policy. He further asserts that her testimony lacks a proper foundation, but again doesn't elaborate. Because Dr. Niebyl's opinion does not deal with formulation of the policy, her lack of participation in formulation is immaterial. Furthermore, her position as head of the University Hospital's Department of Obstetrics and Gynecology is adequate foundation for her medical opinion on pregnancy disability.

For the foregoing reasons, Plaintiff's motion will be denied.

### E. Plaintiff's Motion to Strike Testimony of Dr. Kent Jayne

▉ Jayne offers testimony regarding the basis for the parental leave plan and the University's decision not to provide paid parental leave to biological fathers. Plaintiff argues that Jayne's opinion is inadmissible hearsay, lacks foundation, and is irrelevant. Presumably, Defendants offered Jayne's testimony anticipating the possibility that the Court would apply intermediate or strict scrutiny in its equal protection analysis. In light of the Court's decision to apply rational basis scrutiny in Part II, however, Jayne's testimony is unnecessary. For this reason, the Court finds no reason to address the merits of this motion. It will be denied as being moot.

## II. CROSS MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Walsh v. United States*, 31 F.3d 696, 698 (8th Cir.1994). The moving party must establish its right to judgment with such clarity there is no room for controversy. *Jewson v. Mayo Clinic*, 691 F.2d 405, 408 (8th Cir.1982). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material .... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

▉▉▉ At the summary judgment stage, the Court should not weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter. *Id.* at 249, 106 S.Ct. 2505. Instead, the Court's function is to determine whether a reasonable jury could return a verdict for the nonmoving party based on the evi-

dence. *Id.* at 248, 106 S.Ct. 2505. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in the nonmovant's favor. *Quick v. Donaldson Co.*, 90 F.3d 1372, 1377 (8th Cir.1996). "Because discrimination cases often turn on inferences rather than on direct evidence," the court is to be particularly deferential to the nonmovant. *EEOC v. Woodbridge Corp.*, 263 F.3d 812, 814 (8th Cir.2001) (citing *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994)). "Notwithstanding these considerations, summary judgment is proper when a plaintiff fails to establish a factual dispute on an essential element of her case." *Id.* *See Griffith v. City of Des Moines*, 387 F.3d 733, 735–36 (8th Cir.2004).

## A. TITLE VII CLAIM

Plaintiff claims that the parental leave policy violates Title VII because it impermissibly distinguishes between biological fathers and all other parents, denying biological fathers the right to convert accumulated sick leave to paid parental leave. Plaintiff's amended complaint presents this litigation as a facial challenge to the parental leave policy, primarily based on the adoption leave issue. Plaintiff groups biological mothers and adoptive parents in one group and biological fathers in another. He fashions the claim a "sex-plus" claim. *See Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 118–19 & nn.7–9 (2d Cir.2004) (explaining "sex-plus" as meaning an employer cannot discriminate based on a characteristic tied to sex).

It is important for purposes of this decision to note that Plaintiff brings this suit as a class action. He asserts that the parental leave policy, on its face, systematically excludes biological fathers from using sick leave for caregiving leave. Nowhere in Plaintiff's amended complaint does he charge that the University applies its policy in a discriminatory manner. Ev-

ery count in the amended complaint states that the policy is facially invalid; none asserts "as applied" invalidity.

Except for one instance, the same is true in Plaintiff's motion for partial summary judgment. When describing his claims specifically, Plaintiff does not assert an "as applied" charge. (Pl.'s Mot. for Partial Summ. J. ¶¶ 2–7.) He describes his claims generally, however, as based upon the University's "promulgation, implementation and enforcement of a parental leave policy that, on its face *and as applied*, intentionally excludes men who are biological fathers from benefits conferred upon all other similarly situated employees." (*Id.* ¶ 1 (emphasis added)). This general description of his claims is the one instance where Plaintiff makes reference to an "as applied" claim.

### 1. Applicable Law

Title VII provides that it is an unlawful employment practice for an employer "to limit, segregate or classify his employees ... in any way which would deprive any individual of employment opportunities or otherwise adversely affect his status as an employee because of such individual's ... sex ...." 42 U.S.C. § 2000e–2(a)(2) (2003). This language has been interpreted to encompass employer decisions regarding benefits. *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 682, 103 S.Ct. 2622, 77 L.Ed.2d 89 (1983). It has also been interpreted to apply to employment decisions that favor female employees and disfavor male employees. *Id.*

Under the Pregnancy Discrimination Act of 1978 ("PDA"), 92 Stat. 2076, the University is required to provide pregnancy disability leave to biological mothers on the same terms as it provides leave to other disabled employees. The PDA inserted this provision in the definition section of Title VII:

The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions *shall be treated the same* for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in § 2000e–2(h) of this title shall be interpreted to permit otherwise.

42 U.S.C. § 2000e(k) (emphasis added). Therefore, if an employer provides disability leave to employees disabled to a similar extent as pregnancy, the employer must provide biological mothers the same disability leave. *See Newport News*, 462 U.S. at 683–84, 103 S.Ct. 2622.

■ In *California Federal Savings and Loan Ass'n v. Guerra*, 479 U.S. 272, 285, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987), the Supreme Court held that a California statute requiring certain employers to provide pregnancy disability benefits did not violate Title VII. In reaching this holding, the Court determined that Title VII did not prohibit preferential treatment of pregnancy disability with respect to other disabilities. *Id.* Congress enacted the PDA to ensure that employers could not treat pregnancy worse than other disabilities, but did not mandate equal treatment. *Id.* Under *Guerra*, therefore, an employer may give preferential treatment to women on the basis of pregnancy disability, with respect to employees with other disabilities. The Court was careful to limit its holding to the disability surrounding pregnancy, not the fact of pregnancy itself. *Id.*

■ This Court must give great deference, however, to EEOC regulations issued in furtherance of Title VII. *Holthaus v. Compton & Sons, Inc.* 514 F.2d 651, 653 (8th Cir.1975) (citing *Griggs v. Duke Pow-*

*er Co.*, 401 U.S. 424, 433–34, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)). According to the EEOC:

Disabilities caused or contributed to by pregnancy, childbirth, or related medical conditions, for all job-related purposes, shall be treated the same as disabilities caused or contributed to by other medical conditions, under any health or disability insurance or sick leave plan available in connection with employment. Written or unwritten employment policies and practices involving matters such as the commencement and duration of leave ... shall be applied to disability due to pregnancy ... *on the same terms and conditions* as they are applied to other disabilities.

29 C.F.R. § 1604.10(b) (emphasis added). This EEOC guidance seems to conflict with the Supreme Court's statement that "Congress intended the PDA to be 'a floor beneath which pregnancy disability benefits may not drop—not a ceiling above which they may not rise.'" *Guerra*, 479 U.S. at 285, 107 S.Ct. 683 (quoting the Ninth Circuit's decision below, *Cal. Federal Sav. and Loan v. Guerra*, 758 F.2d 390, 395 (9th Cir.1985)).

The Third Circuit in *Schafer v. Board of Public Education*, 903 F.2d 243, 248 (3d Cir.1990), held that preference given women on the basis of pregnancy disability cannot be limitless. In *Schafer*, an employer's policy gave mothers up to one year of "maternity leave," with no requirement that the leave be related to pregnancy disability. *Id.* at 248. Fathers did not receive comparable leave. The Third Circuit held that, as a matter of law, this violated Title VII. *Id.* The *Schafer* court distinguished *Guerra* in that *Guerra* spoke to a policy which provided preferential treatment regarding pregnancy disability leave, while *Schafer* addressed preferential

treatment of new mothers with regard to caregiving leave. *Id.*

According to EEOC interpretation, Title VII prohibits covered employers from providing any caregiving leave to mothers if the employer does not also provide commensurate leave to fathers. EEOC Compliance Manual, § 626.6. An employer may provide pregnancy disability leave to mothers without providing leave to fathers if mothers are entitled to the leave pursuant to their disability, not their sex. *Id.* Therefore, according to the EEOC, if an employer provides caregiving leave to mothers, it must offer equal caregiving leave to fathers.

These requirements, as evidenced by the facts of this case, are difficult for employers to implement and enforce because every mother is not disabled by pregnancy to the same extent. Additionally, caregiving in some measure is necessarily involved in a mother's disability-related maternity leave.[5] Following passage of the PDA, Title VII requires that if covered employers provide disability leave for other reasons, they must provide pregnancy disability leave on the same terms. If the University were to provide biological mothers caregiving leave not based on disability, and did not provide equal leave to fathers, that would violate Title VII.

## 2. Direct Evidence of Discriminatory Motivation

■ An employment discrimination plaintiff may prove discriminatory intent by either direct or circumstantial evidence. *Griffith v. City of Des Moines,* 387 F.3d 733, 735–36 (8th Cir.2004). The Court's analysis differs based on the strength of the proof the plaintiff offers. *Id.* If a plaintiff offers only circumstantial evidence that prohibited discrimination motivated an employment decision, the Court must apply the familiar three-step analysis established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to determine whether the plaintiff's case can survive a motion for summary judgment. *Griffith,* 387 F.3d at 735–36. If, however, the plaintiff offers relevant direct evidence that prohibited discrimination motivated the employment decision, the Court need not apply the *McDonnell Douglas* burden-shifting analysis because direct evidence is normally strong enough to survive summary judgment. *Id.*

■ Direct evidence of discriminatory motivation is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the employer's decision. *Thomas v. First Nat'l Bank of Wynne,* 111 F.3d 64, 66 (8th Cir.1997). Circumstantial evidence is not as strong as direct evidence; it requires an additional inferential step before a fact finder can conclude that unlawful discrimination was present. *Griffith,* 387 F.3d at 735–36.

---

5. Caregiving leave is unavoidably intermingled with pregnancy disability leave. If a mother gives birth and has a pregnancy-related disability, barring unusual circumstances, there will be a newborn baby at home. Newborn babies require much care, and while mothers are home due to pregnancy disability, they are able to provide care. If the Court were to decide, for example, that any amount of undocumented pregnancy disability leave given to new mothers and not new fathers violates Title VII because there is some caregiving intermingled, it would create an undue burden on employers wishing to provide pregnancy disability leave. If mothers were required to prove their length of disability, employers would have a new, court-imposed duty to ensure they are not providing any caregiving leave. The imposition of such a burden is properly left to Congress or another legislative entity.

The question that must be answered first is whether the parental leave policy, on its face, gives mothers caregiving leave, pregnancy disability leave, or both. Plaintiff claims that the text of the policy is direct evidence that the University discriminates against biological fathers. Defendants assert, however, that there are two distinguishable clauses within the parental leave policy and that neither discriminates based on sex. The first clause, in § 22.8(b)(1)(a), which Defendants identify as the "maternity disability leave policy," provides disability leave to new biological mothers. "Biological mothers are entitled to leave for any period of pregnancy-related temporary disability, to be charged against sick leave. Based on current medical practice, a leave of six weeks or less would not require the employee to provide disability documentation." (Am. Compl. ¶ 20.) The second clause, in § 22.8(b)(1)(b), which Defendants coin the "adoption leave policy," provides adoption leave to adoptive parents. "A newly adoptive parent, including a domestic partner, is entitled to one week (5 days) of paid adoption leave to be charged against sick leave." *Id.*

Under §§ 22.8(b)(1)(a) and 22.8(b)(1)(b) of the policy, biological mothers do not receive the same amount or type of leave as adoptive parents. The policy characterizes the leave provided mothers as "pregnancy disability leave." The University allows any amount of this leave to be charged against accrued sick leave, but requires medical documentation for leave exceeding six weeks. The policy characterizes the leave provided adoptive parents as "adoption leave," and adoptive parents can only charge up to five days against accrued sick leave.

Adoptive parents are entitled to five days of leave, while biological mothers are entitled to six weeks leave without documentation and unlimited leave with documentation of extended pregnancy disability. By definition, neither adoptive parent has a disability resulting from pregnancy, while leave provided biological mothers is pursuant to pregnancy disability. On the face of the policy, adoptive leave is wholly caregiving leave, while pregnancy leave is disability leave.

Based on this cursory analysis, it is clear that adoptive parents must drop out of the equation for Title VII purposes. It does not make sense to compare biological fathers to the group "biological mothers and adoptive parents" because adoptive parents receive different leave than biological mothers, quantitatively and qualitatively. Biological fathers will be compared separately to biological mothers and separately to adoptive parents.

With respect to adoptive parents, biological fathers are not discriminated against based on sex. Both male and female adoptive parents receive five days of adoption leave, and thus, adoption leave is granted on the basis of adoptive parent status, not sex. Therefore, there is no Title VII violation as to the parental leave policy granting adoption leave.

█ The face of the policy giving biological mothers six weeks of pregnancy disability leave is not direct evidence of discriminatory motive. The purpose statement in the policy, § 22.8(a), suggests that all parents are entitled to parental leave: the stated purpose is "[t]o permit parents who have care giving responsibilities to have time off to spend with a child newly added to the family and, to the extent permitted by state law, to be paid during such leave." (Am.Compl. ¶ 20.) The purpose statement, however, does not provide the operative language of the policy. The operative language, as regards biological mothers, is in § 22.8(b)(1)(a). This language provides *pregnancy leave* to biologi-

cal mothers, who also happen to have caregiving responsibilities.

The EEOC Compliance Manual, Notice N–915–058 to § 626, (1990), suggests that "the employer must justify any disparity in parental leave by proving that it is attributable to the woman's disability." According to Dr. Jennifer Niebyl, due to physiological changes that occur to a mother's body after a baby is delivered, it is current medical practice to give at least six weeks of time off after pregnancy. (Defs.' App. at 40.) This is sufficient justification to provide a six-week presumption of disability.

On its face, the University's parental leave policy does not violate Title VII.

### 3. Circumstantial Evidence of Discriminatory Motive

■ Because the policy is not discriminatory on its face, and thereby does not provide direct evidence of discrimination, Plaintiff's remaining proof is entirely circumstantial. Therefore, the Court's analysis will proceed according to the *McDonnell Douglas* framework. 411 U.S. at 802–05, 93 S.Ct. 1817. The burden-shifting framework of *McDonnell Douglas* involves three steps. The first step is to determine whether the plaintiff has set out a prima facie case of sex discrimination, which creates a legal presumption of unlawful discrimination and shifts the burden of production to the defendant. *See Ryther v. KARE 11*, 108 F.3d 832, 836 (8th Cir.1997). In the second step, the defendant must offer a legitimate, non-discriminatory explanation for the challenged action. *Id.; See Rothmeier v. Inv. Advisers, Inc.*, 85 F.3d 1328, 1332 (8th Cir.1996). If the defendant meets step two, the presumption of unlawful discrimination drops out, and in the third step, the plaintiff must demonstrate the defendant's proffered reasons are a pretext for discrimination. *Rothmeier*, 85 F.3d at 1332. *Desert Pal-*

*ace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84, (2003), did not change the third step in summary judgment analysis. *Griffith*, 387 F.3d at 735–36.

■ To avoid summary judgment, the evidence in its entirety must "(1) create[ ] a fact issue as to whether the employer's proffered reasons are pretextual and (2) create[ ] a reasonable inference that [sex] was a determinative factor in the adverse employment decision." *Id.* at 1336–37. "The second part of this test *sometimes may* be satisfied without additional evidence where the overall strength of the prima facie case and the evidence of pretext 'suffice to show intentional discrimination.' " *Id.* at 1337 (emphasis added); *see also Ryther*, 108 F.3d at 837–38 & n. 5. Evidence of pretext by itself, however, will not be enough to avoid summary judgment if it is inconsistent with a reasonable inference of unlawful discrimination. *Ryther*, 108 F.3d at 837; *see also Rothmeier*, 85 F.3d at 1337–38 (finding evidence of pretext which is inconsistent with discriminatory motive actually undercuts claim of discrimination). The focus must remain, however, on the ultimate question of law: "whether the evidence is sufficient to create a *genuine* issue of fact as to whether the employer intentionally discriminated against the plaintiff because of the plaintiff's [sex]." *Rothmeier*, 85 F.3d at 1337.

Plaintiff's circumstantial case consists of two main elements. First, Plaintiff asserts that his wife received caregiving leave paid out of accumulated sick leave, and the University failed to provide him such leave. Second, Plaintiff cites the purpose statement in the policy as evidence of discriminatory motive. Plaintiff asserts that this evidence shows that the University's policy and intent is to give biological mothers caregiving leave to the exclusion of biological fathers.

Plaintiff has alleged discriminatory treatment—the first step of the *McDonnell Douglas* framework—based on biological mothers receiving caregiving leave and biological fathers not receiving caregiving leave. The second step, Defendants' proffered legitimate reason, is that the cited leave is pregnancy disability leave, not caregiving leave. In the third step, pretext, Plaintiff cites both his wife's treatment during her pregnancy leave and the language of the policy's purpose statement.

The purpose statement of the parental leave policy says that policy was designed "[t]o permit parents who have care giving responsibilities to have time off to spend with a child newly added to the family ...." As indicated above, however, the purpose statement is not operative policy language. The statement of purpose also provides no basis to infer that the University applies its policy in a discriminatory manner. While poorly written, it does not evidence an intent to discriminate against biological fathers based on sex.

Because the purpose statement is not evidence of discrimination, the only evidence remaining regards Embree, whom Plaintiff must show was similarly situated. There is a dispute of fact as to whether Embree received partial disability leave or partial caregiving leave after returning to work part time. Plaintiff claims that his wife had four weeks of paid disability leave followed by two weeks of half-time caregiving leave, all paid out of accumulated sick leave. Even if Embree did receive caregiving leave, Plaintiff has not met his burden to show that he and Embree were similarly situated.

 A plaintiff who relies on a showing that other employees were treated differently to show pretext has the burden of showing that those employees are similarly situated in all relevant respects. *Britton v. City of Poplar Bluff,* 244 F.3d 994, 997–98 (8th Cir.2001). This strong showing is required where the only evidence of pretext or discrimination is disparate treatment. *Scott v. County of Ramsey,* 180 F.3d 913 (8th Cir.1999). "To show that other employees were similarly situated, [a plaintiff is] required to point to individuals who 'have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances.'" *Marquez v. Bridgestone/Firestone, Inc.* 353 F.3d 1037, 1038 (8th Cir.2004) (quoting *Clark v. Runyon,* 218 F.3d 915, 918 (8th Cir.2000)). A part-time employee is not similarly situated to a full-time employee. *Lowery v. Hazelwood School Dist.,* 244 F.3d 654, 660 (8th Cir. 2001).

 Embree worked in the University's College of Nursing, and was a part-time employee. Plaintiff worked as a clerk in the University's Registrar's Office, and was a full-time employee. Embree requested leave from her supervisor, Mary Clark, and discussed details of her leave with Debra McFall–Wallerich, a benefits administrator in the College of Nursing. (Embree Aff., Pl.'s 3d Supp.App. at 284–86.) Plaintiff had no contact with these individuals regarding his leave. Embree is not similarly situated to Plaintiff. Even if the final two weeks of leave she received were caregiving leave, Plaintiff has not shown that a similarly situated part-time male employee in the Nursing College would not have received such leave. Or, in reverse, Plaintiff would have to show that administrators in the Registrar's Office granted caregiving leave to a full-time female employee.

Alternatively, Plaintiff's evidence regarding Embree does not support a finding that her leave was caregiving leave. In email correspondence with a supervisor regarding her post-delivery plans, Embree wrote: "I will then take four weeks of

medical (sick) leave. ... I would then like to move to part-time (50%) and ease back into things by working 10 hours/wk at home and taking 10 hours/wk of medical (sick) leave for two weeks ...." Embree states that she took her leave as requested, but that the University required that she get a doctor's release before beginning to work half-time from home. (Embree Aff., Pl.'s 3d Supp.App. at 286.) Considering that she only requested to come back half-time for the final two weeks of her leave, such a release would not show that Embree had no pregnancy disability.

A release to work half-time in her home, pursuant to what was, in her own words, partial "medical (sick) leave," is not a bona fide release to return to work. Embree did not "return to work" in the physical sense and only returned half-time. Moreover, evidence that University administrators were concerned with whether she was still disabled shows that the decisionmaking process was not focused on her sex, but on her disability resulting from pregnancy. The critical difference between Plaintiff and Embree is that Embree was in the process of recovering from pregnancy disability and Plaintiff was not. Thus, even if Embree and Plaintiff were similarly situated in employment terms, the evidence regarding Embree's final two weeks of leave cannot overcome Defendants' proffered reason for providing biological mothers leave.

The dispute of fact with respect to Embree is therefore not a genuine issue of material fact because the evidence offered would not support a jury verdict in Plaintiff's favor. Also, in this class action situation, the treatment received by Plaintiff's wife is insufficient to establish that the University had a policy or practice of granting caregiving leave to biological mothers. The facts underlying Embree's parental leave and the purpose statement, even when considered together, do not

constitute circumstantial evidence sufficient to withstand summary judgment.

### 4. Title VII Conclusion

For the reasons outlined above, the Court finds that Plaintiff has not established that the parental leave policy illegally discriminates against biological fathers facially, or that the University applies the policy in a prohibited manner with regard to biological fathers. The policy does not violate Title VII, either on its face, or in the University's application. Judgment will be entered for Defendants on Plaintiff's Title VII claim.

### B. FEDERAL EQUAL PROTECTION CLAIM

Plaintiff's second claim—Claim II of his federal claims—is that the University violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by providing caregiving leave to adoptive parents and not biological fathers. Plaintiff again frames the analysis as biological fathers versus all adoptive parents and biological mothers. For the reasons stated above, biological fathers must be compared separately to biological mothers and adoptive parents, respectively.

Plaintiff asserts that child rearing is a fundamental right with which the University interfered, and the Court should apply strict scrutiny. With respect to biological mothers, Plaintiff claims that the Court should apply intermediate scrutiny because the policy discriminates based on sex. This Court has determined under the Title VII heading that the policy does not discriminate based on sex, either facially or in the University's application. Therefore, equal protection scrutiny of the pregnancy disability leave clause of the policy is unnecessary. With respect to adoption leave, Plaintiff asserts that the Universi-

ty's policy fails to meet rational basis scrutiny.

### 1. Parental Leave is Not a Fundamental Right

 It is a violation of due process if a state actor infringes upon an individual's fundamental right. *M.L.B. v. S.L.J.*, 519 U.S. 102, 103–104, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). A court must satisfy strict scrutiny before terminating an individual's parental rights. *Id.* Plaintiff contends that the University violated his fundamental parental rights by refusing to grant his request for parental leave. This Court disagrees. There is no fundamental right to be paid for parental leave. Fundamental rights, for equal protection or due process purposes, are negative rights, not positive rights. This means the University cannot unduly interfere with Plaintiff's right to raise his children, but does not mean the University is required to give him leave to do so. The University's failure to provide paid parental leave is not undue interference with Plaintiff's right to raise his children in the manner he sees fit. Plaintiff's claim is not based on any statute or case law and this Court will not apply strict scrutiny.

### 2. Rational Basis Review

#### (A) Applicable Law

 "Under rational basis review, challenged statutory classifications are accorded a strong presumption of validity, which is overcome only if the party challenging them negates 'every conceivable basis which might support it.'" *Indep. Charities of Am., Inc. v. Minnesota*, 82 F.3d 791, 797 (8th Cir.1996) (quoting *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)). Under federal equal protection analysis, the purpose relied upon in litigation need not have been the actual purpose of the policy when it was adopted. Evaluating a statute, the Supreme Court stated:

> Where, as here, there are plausible reasons for Congress' action, our inquiry is at an end. It is, of course, "constitutionally irrelevant whether this reasoning in fact underlay the legislative decision," *Flemming v. Nestor*, 363 U.S. [603,] 612, [80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960)] because this Court has never insisted that a legislative body articulate its reasons for enacting a statute. This is particularly true where the legislature must necessarily engage in a process of line-drawing. The "task of classifying persons for … benefits … inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line," *Mathews v. Diaz*, 426 U.S. 67, 83–84, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976), and the fact the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration.

*United States R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980).

 The Supreme Court has treated policies promulgated by administrative agencies as if they were those of the state for purposes of equal protection analysis. *See New York City Transit Auth. v. Beazer*, 440 U.S. 568, 592, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979). The Supreme Court has said "the Equal Protection Clause was aimed at all official actions, not just those of state legislatures." *Columbus Bd. of Ed. v. Penick*, 443 U.S. 449, 458 n. 5, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979). "A state university without question is a state actor." *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 192, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988).

 *Fritz* establishes that Congress need not articulate its reasons for enacting a statute. *Id.* By extension, a public uni-

versity need not articulate its reasons for establishing a policy. Inclusion of a purpose statement in a policy does not change the fact that the policy, like most legislative acts, is the product of multiple, discrete purposes acting in concert to reach a final result. The adoption leave clause and the pregnancy disability leave clauses of the University's parental leave policy came as the result of different rounds of collective bargaining. Of course, collective bargaining or not, a state university is subject to the requirements of the Equal Protection Clause because it is a state actor.

**(B) Analysis**

The purpose section of the parental leave policy states that its purpose is

> [t]o permit parents who have care giving responsibilities to have time off to spend with a child newly added to the family and, to the extent permitted by state law, to be paid during such leave. To adapt an employee's work schedule and/or duties to help reduce conflict with parental obligations.

(Am.Compl. ¶ 20.) This purpose applies to both subsections in the policy. Defendants assert multiple justifications for providing adoptive leave to adoptive parents, and no commensurate leave to biological fathers. Essentially, Defendants argue that adoptive parents face expenses and pressures that biological parents do not, and the purpose of providing adoption leave is to alleviate these additional burdens.

The most significant difference adoptive parents face is that they often pay for the childbirth expenses of the biological mother from whom they are adopting. The University's health insurance plan covers childbirth expenses for employees and spouses of employees who give birth, but does not cover employees who are prospective adoptive parents and pay expenses for the birth mother. There are also more legal requirements for adoptive parents to satisfy than there are for biological parents. The University allows prospective adoptive parents to use their sick leave under the policy to satisfy pre-adoption administrative requirements (Gorman Aff., Defs.' App. at 21). Another significant difference is that adoptive parents often have less time to prepare for the arrival of a child because they do not know the timeframe when they might receive the child. At minimum, they get less notice than a pregnant mother.

Alleviating adoptive parents' unique burdens is a legitimate purpose. Providing five days of paid adoption leave is rationally related to this purpose. Under rational basis scrutiny, the means by which the state actor tries to reach the purpose set forth need not be mathematically precise. *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 813, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976).

Plaintiff focuses his argument on the purpose set out in the parental leave policy. The text of the policy says its purpose is to provide time off to parents with caregiving responsibilities. The Equal Protection Clause does not bind the University to this statement of purpose. Even if the analysis was limited to only the purpose asserted in the policy, the University satisfies the low requirements of rational basis scrutiny. The University does provide parental leave to some parents with caregiving responsibility. Although not "mathematically precise," in that biological fathers do not receive parental leave, the leave is rationally related to the asserted purpose.[6]

---

**6.** The statement of purpose and the policy as a whole do, however, treat biological fathers unfairly. As previously mentioned, overall, the parental leave policy is poorly crafted and poorly conceived. An equal protection suit is not the proper means, however, by which to address unfair or even bad policies. The proper course is through the administrative

Plaintiff does not sufficiently discredit the legitimate purposes set forth by Defendants. Additionally, he fails to demonstrate the lack of a rational relationship between the operation of the policy to the purpose in the policy. Therefore, he has not met his burden of negating all possible legitimate purposes and showing no rational relationship. Judgment will be entered for Defendants on the federal equal protection claim.

### C. IOWA CIVIL RIGHTS ACT CLAIM

In Plaintiff's first state claim, he asserts that Defendants' policy violates the Iowa Civil Rights Act ("ICRA") by discriminating based on sex. Iowa courts have used federal law for guidance in interpreting the ICRA. *See Falczynski v. Amoco Oil Co.*, 533 N.W.2d 226, 230 n. 2 (Iowa 1995) (the analysis of discrimination claims under state and federal law is the same) (citing *Hy–Vee Food Stores v. Civil Rights Comm'n*, 453 N.W.2d 512, 516 (Iowa 1990)); *Boelman v. Manson State Bank*, 522 N.W.2d 73, 79 (Iowa 1994) ("Iowa Supreme Court has looked to federal cases interpreting Title VII for guidance in applying [Iowa Code Chapter 216]."); *King v. Iowa Civil Rights Comm'n*, 334 N.W.2d 598, 601 (Iowa 1983). Applying this Court's Title VII analysis to Plaintiff's ICRA claim, the Court concludes that the policy does not violate the ICRA. Judgment will be entered for Defendants on the ICRA claim.

### D. IOWA EQUAL PROTECTION CLAIM

In his second state claim, Plaintiff claims the University's policy violates the Equal Protection Clause of the Iowa Constitution. Iowa Constitution, article I, § 6. As a general rule, the Iowa Supreme Court follows federal equal protection analysis when construing the Iowa Equal Protection Clause. *In re Morrow*, 616 N.W.2d 544, 547 (Iowa 2000). In February 2004, however, the Iowa Supreme Court decided *Racing Ass'n of Cent. Iowa v. Fitzgerald*, 675 N.W.2d 1 (Iowa 2004), *cert. denied* 541 U.S. 1086, 124 S.Ct. 2820, 159 L.Ed.2d 248 (2004) (hereinafter "*Fitzgerald III*"). After the United States Supreme Court reversed the Iowa Supreme Court's decision on federal equal protection grounds, *Fitzgerald v. Racing Ass'n of Central Iowa*, 539 U.S. 103, 123 S.Ct. 2156, 156 L.Ed.2d 97 (2003) (hereinafter "*Fitzgerald II*"), upon remand, the Iowa Supreme Court, this time relying upon Iowa equal protection standards, reinstated its original decision. *Fitzgerald III*, 675 N.W.2d at 15; *See Racing Ass'n of Central Iowa v. Fitzgerald*, 648 N.W.2d 555, 562 (initially finding an equal protection violation) (hereinafter "*Fitzgerald I*").

*Fitzgerald III* poses unresolved issues regarding Iowa equal protection litigation. In *Fitzgerald I*, the Iowa Supreme Court noted, "Iowa courts are to 'apply the same analysis in considering the state equal protection claims as ... in considering the federal equal protection claim.'" 648 N.W.2d at 558 (quoting *In re Morrow*, 616 N.W.2d 544, 547 (Iowa 2000)). The court applied the usual federal equal protection test. It found that the legislation at issue, a tax statute that taxed gambling establishments differently, violated both the federal Equal Protection Clause and the Iowa Equal Protection Clause. *Fitzgerald I*, 648 N.W.2d at 562 (finding racetracks

---

process by which the University makes employment policy. Defendant State Board of Regents or the Iowa legislature are also entities that can address such concerns. This Court acting under the Fourteenth Amendment cannot overturn even a bad policy if it is rationally related to a legitimate purpose. The Constitution leaves this to legislative entities.

and river boats similarly situated, and no rational basis for the differential tax at issue).

However, after the United States Supreme Court reversed on federal equal protection grounds, *Fitzgerald II*, 539 U.S. at 110, 123 S.Ct. 2156, the Iowa Supreme Court re-examined the statute under the state constitution's Equal Protection Clause. *Fitzgerald III*, 675 N.W.2d at 6. The court noted its exclusive right to change Iowa's equal protection analytical model so that it differed in some respect from federal analysis, but did not do so. *Id.* Instead, the court *re-applied* the same federal equal protection analytical model the Supreme Court used in *Fitzgerald II*. The Iowa court refuted the rational bases the Supreme Court found in its opinion, and determined once again that there was no rational basis for the tax statute. *Id.* at 6–9.

The Iowa Supreme Court cited *Bierkamp v. Rogers*, 293 N.W.2d 577 (Iowa 1980), as a previous example of the Iowa Equal Protection Clause having a broader scope than its federal counterpart. *Fitzgerald III*, 675 N.W.2d at 6–7. The Iowa court made it clear, however, that it still considered federal equal protection cases persuasive in Iowa equal protection analysis. *Id.* at 5–7. The Iowa court's test was a more searching application of the federal test, though couched in the same terms.

■ To determine the proper analysis of cases implicating the Iowa Equal Protection Clause, it is necessary to evaluate both *Fitzgerald III*, and *Bierkamp*. These are two cases where the Iowa Supreme Court departed from federal rational basis equal protection analysis. Iowa rational basis analysis is more searching than federal equal protection analysis in evaluating the relationship between the proposed purpose and the legislation as a means to achieve that purpose.

In *Bierkamp*, the court held that the Iowa guest statute violated the Iowa Equal Protection Clause. The first proposed purpose for the guest statute was that drivers would be more hospitable (i.e., the hypothetical driver would offer a ride to a hypothetical guest more often) if he or she would not be liable for the passengers' injuries. *Bierkamp*, 293 N.W.2d at 582. The court rejected this proposed purpose. *Id.* ("No matter how laudable the State's interest in promoting hospitality, it is irrational to reward generosity by allowing the host to abandon ordinary care and by denying to nonpaying guests the common law remedy for negligently inflicted injury.")

The second proposed purpose for the guest statute was that it was designed to prevent collusive lawsuits. The court rejected this purpose on the basis that the statute was grossly underinclusive and overinclusive in reaching such a goal. *Id.* at 584. The court reasoned first that those who wanted to collude could get around the statute by lying about passenger compensation, which amounted to underinclusion. *Id.* Second, the court identified that the statute denied relief to many more arguably deserving claimants, who would not collude, than it prevented collusive claimants, amounting to overinclusion. *Id.*

The central difference between *Bierkamp* and *Fitzgerald III* is that the *Bierkamp* decision came 51 years after the United States Supreme Court decision with which it was at odds on the rational basis issue. *See Silver v. Silver*, 280 U.S. 117, 50 S.Ct. 57, 74 L.Ed. 221 (1929) (finding a rational basis for guest statutes). The Iowa court made the point that "[w]hatever feature or features which may once have distinguished automobile guests from guests in other conveyances or other contexts no longer exist." *Bierkamp*, 293 N.W.2d at 585. *Fitzgerald III*, however, followed the United States Supreme Court

ruling in the same action. *Compare Fitzgerald III,* 675 N.W.2d 1 (Iowa 2004); *with Fitzgerald II,* 539 U.S. 103, 123 S.Ct. 2156, 156 L.Ed.2d 97 (2003).

██ The *Fitzgerald III* decision is fairly new, and the Iowa Supreme Court has not had the opportunity to expound on any effect it may have had on Iowa equal protection analysis. *Fitzgerald III* only purported to change the depth of analysis under the Iowa Equal Protection Clause. Therefore, this Court, under *Fitzgerald III* and *Bierkamp,* needs only carry out a more searching analysis of the relationship between the University's asserted purpose and the means it used to reach that purpose. Every other aspect of Iowa equal protection analysis parallels federal analysis.

As this Court found, in its federal equal protection analysis above, the purposes Defendants set forth are legitimate, and the University's parental leave policy is rationally related to achieving those purposes. This is so even under the more searching analysis required by the Iowa Equal Protection Clause. For the reasons stated above, judgment will be entered for Defendants on Plaintiff's Iowa equal protection claim.

## CONCLUSION

For the reasons outlined above, Defendants' motion to strike references to Jennie Embree is DENIED, Plaintiff's motion for leave to file a surreply is GRANTED, Plaintiff's motion to strike Defendants' responses is DENIED, Plaintiff's motion to strike testimony of Dr. Jennifer Niebyl is DENIED, Plaintiff's motion to strike testimony of Dr. Kent Jayne is DENIED, Plaintiff's motion for partial summary judgment is DENIED, and Defendants' motion for summary judgment is GRANTED. Plaintiff's motion to amend order certifying class, filed September 7, 2004, is now moot and is DENIED.

Judgment shall be entered on behalf of Defendants on all of Plaintiff's claims.

IT IS ORDERED.